and it is docket 25-6052, counsel please proceed when you're ready. May it please the court. My name is Bonnie Blumert, I am a federal defender and I am here on behalf of Darius Jackson. My argument today will consist entirely of discussion of the first issue that was originally briefed regarding firearms and relevant conduct. Mr. Jackson has conceded the second issue regarding domestic violence, a domestic assault conviction as a crime of violence. What remains is that this case is about guns that Mr. Jackson never possessed, guns that other individuals possessed and sold. Those guns are not relevant conduct under the guidelines and the trial court erred in finding them to be so. It did not make the required findings, it made no distinction between co-conspirators and then incorrectly concluded that the acts of others were within the scope of jointly undertaken activity. Why is that wrong? Jointly undertaken activity, why is this not a good definition? Jointly undertaken activity, even if you're not the one selling the firearm, if you benefit from being in a group that's together and selling firearms and watching out for each other, that sounds like plenty to me, why not? So there has to be some sort of agreement as to what the person believes they're doing and certainly believing you are benefiting in some way, believing you're helping your friends conduct sales. Well, they're all in the car together and probably not by accident. They are in the car together, Judge, they ride there. But what's missing from the record is whether those individuals specifically got in the car to go to the sale. That's not clear. There's indications that the person that they know who invites them to this transaction is with the undercover officers and with this confidential informant. And this person texts at least one individual in the car to come to the site, to the location. It is not clear that the other people involved are intending any specific action at all when they're on their way there. We don't know if they even really know what's going on before they get there. So when they arrive, the first person gets out to start conducting a gun sale. The other individuals don't get out of the car, they stay in the car. They stay in and they let this other person do this transaction. They're not involved in it, they're not engaged with it, they don't. They hand them $400 and say, here's four for your strap. So there's no specific evidence about what exactly that statement means. Certainly we can extrapolate that the slang term strap is in reference to a firearm. But because Mr. Jackson is not out of the car during that sale, and then the sale that he actually undertakes on the separate day, on the second day, he does that sale himself. So what it may seem actually is that that statement is money about a previous agreement that they have. There's a debt there that Mr. Hawley owes Mr. Jackson money. So Mr. Jackson certainly receives the money from that sale. But receiving money from any sort of transaction doesn't mean you're cosigning the transaction, that you're involved in it, invested in it. This person owes you money. However they get that money isn't up to you, and that's not. Isn't this a lot like the illustration number eight to commentary 1B1.3A, where they talk about people walking across the border together for mutual assistance and protection? There's nothing in that illustration that talks about that they had to come to an agreement. You know, it's just that by grouping up, they all benefit from it. Is this the example Your Honor is talking about where they go collect backpacks from an individual? Yes, they receive individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Under this scenario, each defendant is accountable for the aggregate quantity of marijuana transported by the four defendants. So in that scenario, there is a specific affirmative understanding that that is why they're together. I mean, where do you get this affirmative understanding? And why isn't such affirmative understanding equally implied by the facts here? So in that example, of course, we don't have the benefit of a full record. The example just says these are the facts. This is what's happening. They have agreed to do this together. In the example in our case— Well, it doesn't say they agreed to do it together. It said they walk across the border giving each other mutual assistance and protection. For them to be at the border, to have received this package at some point in advance from whoever this other individual is, lets us understand very clearly that they receive these backpacks, they go to this location, and then walk across together. In our scenario, we have individuals that are at a certain location, but we don't know that they know when they get there that they're doing something together. This is all extrapolations that the court has to make. They're all in the car together. They travel together in the car to the place where the criminal activity takes place. I mean, I see it as very similar to the illustration. They are similar, but our case lacks the specific facts that tell us that that is what's happening. The government has the burden to put on evidence to show what exactly is going on, to know what the judge— the facts are before the court so it can make its analysis. Well, what's the alternative view that they're in the car for some other reason? What's the other reason? If they're riding around with their friends and they're doing something, and then one individual says, hey, I got a text, I want to go over here and sell my gun. We don't even know if he tells the other individuals in the car what he's going to do. That's not in the record. It's not clear. What's the overlap in the people on the two different occasions, the next day and the day before? So, Mr. Jackson, the defendant in question, on day one, he has one individual with him, Mr. Beach. On the second day, Mr. Beach is also present, and then there's four other individuals. Those individuals are not present on the other day. We only know one of those other individuals by name, Mr. Hawley, that gets out of the car that sells a firearm. And we have six firearms here that are used for the guideline application. All you need is three for two levels. How do the six come into play, and why do they not have three? So, certainly, Mr. Jackson has his one from August 12th that he sold at the gas station. The other gun that Mr. Hawley sells can be attributed to him. Do you concede that? Because he takes the money for it. I think that's a reasonable inference, essentially. But that leaves us with two guns. The other firearms that Mr. Beach possesses, and then the ones that are in the car, are the additional ones that put us over that three-gun threshold. The firearms that are in the car are never used in this sale. The individuals keep them with them. They're sitting in the back seat. They never make any attempts to get out, to brandish them, to threaten anybody with them. And they are essentially just sitting back there with them. And the only reason we even know that those are there is because somebody asks Mr. Hawley, do other people have guns, and he just says yes. He doesn't say anything about what they're for. For all we know, they just carry them on their person all the time. They make no effort to get out of the car and sell those firearms. Let me ask you this. The district court concluded that there was an implicit agreement between Mr. Jackson and other members of the group to facilitate each other's sale through, at a minimum, logistical and protective support. And based on Jackson's pattern of coordinated travel and presence during other transactions, he jointly undertook with his co-travelers the transportation, possession, and sale of multiple firearms. Are those findings a fact that you have to contend are clearly erroneous? They are improper extrapolations based on the quantity of the evidence present. So the Ellis case— That might be how you challenge them as clearly erroneous, but I first want to know what the standard of review is here. If these are findings of fact, do we review it under the clearly erroneous standard? So we review relevant conduct de novo. To constitute clear error— Excuse me. An evidentiary finding that the evidentiary sufficiency of a court's finding in here as to the scope of jointly undertaken activity, we review for clear error. To constitute clear error here, we must be convinced, this court must be convinced, that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal. So if that's the standard that we're analyzing in the court's findings, the ones that Your Honor just read, those are impermissible in light of the entire record because what the court did was focus on what would otherwise be some innocuous pieces of information, that Mr. Jackson is present with individuals, that he traveled with individuals, and that everyone there is armed. But we have to look at the entire record, and the court ignored numerous specific facts. The court ignores that the sales are conducted individually. The court ignores that the sales are done one by one, that each person gets out, does his own negotiation, that he decides how much the gun costs, he decides whether he makes the transaction, and then he gets back in the car when it's done so somebody else can get out and do theirs. There's also a slew of information that's missing. We don't understand the exact agreement, the knowledge of the individuals that they have when they arrive there, specifically on day two. That is missing. The government could have put on text messages, witnesses, any other additional evidence to show what those individuals thought they were doing when they got there, what they think is going on, and what they're participating in. And that's the exact question that the court is supposed to determine. What is the jointly undertaken criminal activity? What do they each agree to by themselves? We can't just understand that the conspiracy or the agreement overall is to make gun sales, because we have to say what each person specifically agreed to, that Ellis requires that, Melton requires that, Figueroa-Librato requires that, and this court doesn't do it. The cases that you all just rattled off, they're either conspiracy cases or aiding and abetting cases. Does that matter? That's not what this case is. It doesn't matter. The 1B1.3 guideline basically says whether or not it's charged as a conspiracy. It is irrelevant. Whether people have specific conspiratorial agreements can be factors the court considers in making this determination, but there's no need to have a specific conspiracy, because jointly undertaken activity for the purpose of sentencing attribution as relevant conduct can be different than just conspiratorial liability. Because co-conspirators, you might be under that theory, you're in for a penny, in for a pound. It can be broader. It is broader. That favors the government. The court has to say, though, what each person agreed to. And in Melton, the individual there, he agrees to participate in this money counterfeiting operation. But his specific agreement is to, he gets the building, and he helps with providing some manpower to sort of guard and work on it. After he's arrested, there's an additional quantity of money that is printed later. Certainly, that would be part of the conspiratorial agreement, that he understands he's agreeing with others to print fake money, and it would be foreseeable that they would print large quantities of it based on the equipment that they had. But the court found that because of his specific agreement, it did not cover that money, that even though that money would have covered you in a conspiracy, it didn't cover for this purpose. And that's why, in a conspiracy case, the sentencing court has to be more careful, because you've got the overall conspiracy, and then you have individual participants. Can you point me to a case that has the same kind of parameters, where it's neither a conspiracy nor an aiding and abetting charge? I don't recall finding any in particular where individuals were charged separately as they were here. It's not clear to me why the individuals in this case were charged separately. There's a footnote that the other two were charged in the Western District and were prosecuted for their conduct in connection with this. But, and I see, Your Honors, I'm essentially out of time. I would like to reserve the remainder for rebuttal. May it please the Court, I am Bo Bottomley on behalf of the United States. The District Court properly found four firearms possessed and sold by others were attributable to Mr. Jackson as relevant conduct. First, I would like to address the defendant's argument that the District Court did not make particularized findings as to the scope of the jointly undertaken criminal activity. Second, I would like to address whether his findings regarding the scope were clearly erroneous. First, the District Court understood the need to make particularized findings as to the scope of the jointly undertaken criminal activity. He read on the record 1B.1.3. Then he went through it. He then stated that he must make a particularized finding as to the scope of the jointly undertaken criminal activity considering any explicit or implicit agreement fairly inferred from their conduct. First, the jointly undertaken criminal activity is a plan, is a criminal plan or scheme undertaken by the defendant in concert with others. Here the District Court stated the criminal scheme and plan was to on multiple occasions transport, possess, and sell multiple firearms to the undercover agents. The District Court stated the record reflects that on at least two occasions the defendant agreed with others to provide logistical support and protective support to carry out that plan. That's the scope. Additionally, the District Court in a statement of reasons did adopt the PSR. What I want to jump into next is just the facts. And again, as this Court stated, this Court reviews the evidentiary sufficiency of the District Court's findings as to the scope of the jointly undertaken criminal activity only for clear error. Just to straighten me out, and I'm sure you're right and I'm wrong, but you said four firearms. I'm looking at paragraph 12 of the PSR, at least a PSR, that says the offense involves six firearms. Yes, Your Honor. I was talking about the four firearms that were possessed by the others. So I would attribute there was one firearm on day one that was paid for and he received the cash. That to me is very clearly his. And then on the second day he hands another. So I'm specifically talking about the four others. Okay, I understand. Is it two or six? That's the choice? In other words, there's no way to get to three, four, or five? I mean, I think you could find, this Court could find on day one, they would attribute all the weapons to the defendant, but not day two. But I think the stronger argument, because they're pretty similar, is that all six are attributable to the defendant, Mr. Jackson. The District Court did not clearly err when it concluded regarding the scope that the defendant and others had at least an implicit agreement to provide each other logistical, by saying logistical, transporting the firearms on day one, and then sharing location information as to where they were going to meet up with the undercover agents, and then protective support, providing protection with their person and, of course, with their firearms. I think it's important to look at the bigger picture of what's going on here. The undercover agents have communicated to this group of gentlemen that they want to buy firearms, they want to transport them to Kansas City, and then they want to sell them at a higher price. So that's kind of the big picture of what Mr. Jackson, Mr. Beach knew, and then there was certainly others involved. Now, what did Mr. Jackson want to do? What did Mr. Beach want to do? Mr. Hawley and Benford, they wanted to be the supplier of those firearms. So on day one, we see Mr. Jackson actually, after he's done the sale, he actually goes into the car of the undercovers and looks at where they store or hide firearms, such as they would do when they were transporting them to Kansas City. So this is not just a one-time thing. He is seeing that our goal as Jackson and Beach is to keep supplying so they can keep distributing. So he goes in there, he sees that. On day two... I'm sorry, I'm not following. You think that Jackson going and looking in the undercover officer's car to see how they store the firearms is evidence of his implicit agreement with the other defendants? I would say yes, but I think more importantly it's his understanding that we are going to supply you firearms not only today, but going forward. And so it seems to me that it is a kind of a group understanding. We as a group are going to be providing you firearms. And then practically, how are they going to do this? How are Jackson, Beach, and the others going to do it? They're going to do it through logistical and protective support. And so just looking at August 12th, so that's day one, the undercovers arrange to buy firearms from a Mr. Benford and his associates. They pick up Mr. Benford. He then makes a phone call to another person, and then they arrive with two firearms that they intend to sell. So there is logistics going on there. There's transportation. Now, this is an inherently dangerous situation. Anybody coming into this situation, it could be inferred that they are going to tell their associates why we are going to where we are going, and why you need to bring your firearms. This is not a situation, it would be unreasonable to say, that these six persons coming in the vehicle didn't know why they were there. And specifically, we know that two firearms were seen by the undercover agents. One was an AK-47, and then another was a pistol. Now, why is that important? Now, it may be difficult to kind of hide an AK-47, but it's easy to hide a pistol, right? In fact, we know that they were all supposedly possessing firearms, but only two of them were seen. I think that's important to go as to the intent of the people in the car. Why were they there? They were there to be kind of a show of force. The evidence indicates that this was their first meeting, right? So Mr. Beach, Mr. Hawley, Mr. Benford, they don't know who these people are. Are they to be trusted? Are they dangerous? I mean, clearly it is a dangerous situation. So why are all of these other men there? They're there for security, and that's what they're doing. Isn't it possible that Jackson gets into the car and he's with friends and he doesn't really know what they're up to? I mean, should he then be liable for everything that these people do? Is it possible? Yes, it's possible. But again, the standard is, is the district court's findings plausible? Can it be inferred based on the evidence? And again, what we would state is this is an inherently dangerous situation that they're going to. Usually people in this situation aren't just going to bring another witness to see them commit a crime. They're going to bring along people that they know are part of what is going on. And again, this goes to what can the judge reasonably infer? What is plausible? Well, on day one, Mr. Jackson actually participates. I think we can assume we know what they're referring to a firearm when they gave him the $400. On day two, is there any active participation by Mr. Jackson other than he's there as support and protection? Yes, Your Honor. As I read the PSR, Mr. Beach sells an Anderson Manufacturing multi-caliber pistol, and then Mr. Jackson sold the Springfield pistol. So he actually sold that one. And then what we also see afterwards, again, as we're looking at the bigger picture, the undercover agents, they say, hey, we are buying so that we can sell in Kansas City. Mr. Jackson, Mr. Beach, hey, we're going to be your suppliers. What we see at the end of that second day is Mr. Jackson communicating to the undercovers that he wants to sell them machine gun conversion devices. So again, we have a plan. We're going to be selling to these distributors, and we're going to keep doing it. And it's not just a one-person thing. This is clearly Mr. Beach, Mr. Jackson are involved on day one, day two, and then, of course, Mr. Jackson has this continuing plan. Let's see if there's anything else I wanted to cover. Unless this Court has any questions, we would just ask that this Court affirm the district court's sentence. Thank you, Counsel. Thank you. We'll give you a minute and a half, just so you don't get caught right in the middle of a sentence. Thank you, Your Honor. Thank you, Your Honor. The main thing that this Court needs to find is that the findings that the trial court made were insufficient, and that is clear error and enough to essentially remand without even having to, not sending back for specific findings, because the record is complete. The government had its bite at the apple. The evidence that's there is insufficient. The Court made a number of inferences in coming to its conclusion, and many of those inferences are not fully supported by the record. The evidence is not sufficient. It's not there. The Court's determination was conclusory. It was too broad, and it did not lay out specifically what Mr. Jackson agreed to. The Court did not also adopt the pre-sentence report, specifically the analysis. The government talks about how the Court, we can look at not only the Court's oral ruling, but also the addendum, the probation officer's writings in the addendum of the PSR, that that was actually not adopted. Federal Rule 32, little I-3, indicates that the findings that are in a PSR do not become record absent unexpressed ruling. The Court, specifically in our case, adopts the PSR in the statement of reasons just by checking the box. But the Court says specifically during the oral argument and during the sentencing hearing that the Court says, now before formally adopting the PSR as my findings on all undisputed factual matters, then the Court goes on to discuss other issues. The analysis that the probation officer makes in the PSR addendum is disputed, and so that was not adopted by the Court, and the only thing that the Court can look at is, that this Court can look at is the Court's oral ruling at the hearing. We ask your honors to remand for resentencing in accordance with our requests. Thank you, counsel. Thank you both for your helpful arguments. You are excused. The case is submitted.